# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

ROBBIN L. JONES,                          :

                 Plaintiff,       :

  vs.                                            :

MICHAEL J. ASTRUE,                    :
     Commissioner of the Social
     Security Administration,            :

             Defendant.        :

Case No. 3:08CV00224

District Judge Walter Herbert Rice
Magistrate Judge Sharon L. Ovington

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    INTRODUCTION

Plaintiff Robbin L. Jones underwent a surgical lumpectomy in 1998 to remove a malignant tumor from her right breast, with removal of multiple lymph nodes[2] and follow-up surgery in 1999.  Since that time, she has suffered from lymphedema and neuropathic pain in her right arm, and from depression.  Her last job, as an appointment clerk for Humana, ended in May 2002, after 18

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

[2] While the parties refer to differing numbers; a surgical pathology report dated May 15, 1998 confirms the removal of 14 benign lymph nodes.  (*See* Tr. 173).

months of attempting unsuccessfully to transition back to work. She filed an application with the Social Security Administration for Disability Insurance Benefits ["DIB"] on April 24, 2003, alleging that she became disabled on May 21, 2002. Plaintiff met the insured status requirement of the Social Security Act through December 31, 2007. (Tr. 17).

Plaintiff's claim was denied initially and on reconsideration before she was granted two administrative hearings, on September 7, 2005 and June 7, 2006. On December 8, 2006, Administrative Law Judge ["ALJ"] Thomas R. McNichols, II, issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 14-25). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This matter is before the Court on Plaintiff's Statement of Specific Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #13), Plaintiff's Reply (Doc. #14), the administrative record, and the record as a whole.

## II.    BACKGROUND

### A.    Plaintiff and Her Testimony

At the time of the ALJ's decision, Plaintiff's age (43) placed her in the category of a "younger individual" for purposes of resolving her DIB application. *See* 20 C.F.R. § 416.963(c). Plaintiff has a high school education. *See* 20 C.F.R. § 416.964(b)(4). Her past employment included work as an account representative, assembly line worker, data entry clerk and hair stylist. (Tr. 93).

At her initial hearing on September 7, 2005, Plaintiff testified that she was 42 years old, married, and the mother of a 20-year-old daughter. (Tr. 491-92). She had a driver's license but drove only about twice in a typical week, as the vibration of the steering wheel caused her right arm to hurt and to swell. (Tr. 493). She drives an automatic and keeps her right arm on her lap. (Tr. 517). Plaintiff confirmed that she is right-handed. (Tr. 491; *see also* Tr. 529).

Plaintiff last worked in May 2002, when she was unable to continue due to pain and swelling in her right arm caused by fluid accumulation after removal of lymph nodes in conjunction with her breast cancer surgery. (Tr. 494). Despite that problem, she had worked intermittently for about 18 months after her surgery, while undergoing therapy in the hope that it "would help loosen everything up and keep things going." (Tr. 494-95). She reported that her arm "stays swollen all the time," and is "always painful." (Tr. 496). "[T]he swelling will go down . . . to a certain level . . . [b]ut if [the arm is] used, it will swell up

3

even more." (*Id.*). Plaintiff reported that she can use that arm "[o]n occasion[]," but primarily for "assistance," and does so as little as possible. (*Id.*). She said that she cannot hold heavy things in that hand, because "I don't have a grip," and as to light things, "I could pick it up, but as far as holding it, then no, [I] could drop it at any time because I would lose the strength in my right hand." (Tr. 496-97). She is able to write, but not repetitively, and does not use her right hand to button or zip clothes, etc. (Tr. 497).

Plaintiff reported that physical therapy was the only treatment that she had received for the problems with her right arm, but that her doctor had told her to discontinue the therapy because the "repetitive movement" caused her arm "to swell even more, even faster." (Tr. 497-98). At the suggestion of Dr. Jump, a doctor she saw twice in 2003, she tried a compression sleeve, but without success. (Tr. 498-99). She sees her family physician, Dr. Timpone, "every two to three months." (Tr. 504). She contradicted Dr. Timpone's April 28, 2005 statement that she "could rarely reach above [her] shoulder level," saying his statement presumed successful physical therapy, and she no longer can do so at all. (Tr. 499-500). She denied any other physical problems. (Tr. 500).

Plaintiff reported that she does have difficulty "concentrating" and "remembering different things." (*Id.*). She did not know why – "I didn't even

realize I was having [memory lapses] until other family members [reminded] me of things that I was supposed to be doing. Or if I'm doing something at the house and I'm standing there going where was I going with this." (Tr. 500-01). She said that she went to counseling for "three or four months" about the memory issues, but stopped in September 2004 because "[o]ur insurance no longer covered it." (Tr. 501-02). She was continuing to take Zoloft and Ambien for depression, which manifested as abnormal sleeping habits, "crying spells and just different things that was going on, and I didn't know it was going on." (Tr. 502). The anti-depressant medication "seemed to help" (Tr. 503), although "I think it hinders my memory, especially the Ambien." (Tr. 504). She has not discontinued Ambien, though, because with post-surgical complications such as hot flashes, "I have to take an Ambien every night to go to sleep." (*Id.*).

Plaintiff was taking no prescription pain medication, because "I just try to take the Motrin or something over-the-counter that's more affordable." (Tr. 503). The pain in her right hand, arm and shoulder has "never stopped" since her breast surgery in 1998. (Tr. 505). "It's every-day pain . . . It's like an ache . . . Probably around between five and six" on a zero to 10 scale of pain. (Tr. 506). "Sometimes" the Motrin helps. (*Id.*).

Plaintiff said that the problems she described seem to stay "about the same." (Tr. 507). She uses her right arm "[h]ardly at all." (*Id.*). "Maybe once or twice" a day for "maybe two or three minutes," but less than 10 minutes a day." (Tr. 508). "I don't use both arms to lift" (*id.*), but could lift "I would say less than 10 pounds" with both arms "[b]ecause I don't have any strength in my right arm." (Tr. 509). She does not think that she could do her prior work "[b]ecause of the repetitive movement that I would have to use to key in," and other sitting work would present similar problems. (*Id.*). She does some cooking at home, but does not wash dishes, sweep, mop, vacuum, do laundry, make beds, or do yard work or gardening. (Tr. 509-10). She sometimes shops or visits friends or relatives, goes to church and to the movies, but does not have any hobbies, participate in sports, or exercise. (Tr. 510-11). She is able to feed herself, but cannot wash her own hair or back, do her nails, or button or zip clothing from the back. (Tr. 512).

Describing her typical day, Plaintiff said, "I usually get up between like 4 and 4:30 a.m. . . . because of the night sweats. Then I lay back down around 7." Usually her husband or daughter prepares some breakfast for her before leaving, and "I'll eat before I take my medication." The Zoloft leaves her "like disoriented," so "I'm up a little bit." (*Id.*). During the afternoon, she will "[j]ust

watch TV and just lay down . . . to get a grip of what I'm not doing or why I can't get focused." (Tr. 513). Sometimes she will try to start dinner, but "it's frustrating" using only one hand. (*Id.*).

The ALJ thereafter continued the first hearing, to allow a consultative physician to evaluate Plaintiff. (*See* Tr. 522-23).

At the hearing re-convened on June 7, 2006, Plaintiff reported that she was continuing to experience pain and swelling that interfered with her ability to use her right hand, although she acknowledged "[s]ometimes" being able to zip or button her pants "[i]f I haven't used [my right hand] a lot before." (Tr. 531-32). She was taking an anti-inflammatory in addition to pain medication. (Tr. 532). She continued to have difficulty concentrating and remembering, which her doctor had said might have been caused by chemotherapy or radiation. (Tr. 533). She was attending counseling once a week, and still was taking Zoloft for depression. (Tr. 534). She reported sleeping " a lot . . . I lay down probably . . . two to three times a day." (*Id.*). Her pain remained at the five to six level on a zero to 10 scale (Tr. 535). She attributed her fatigue to depression. (Tr. 537, 543).

Questioned by her attorney, Plaintiff testified that she could use her right arm "[p]robably no more than like 15 minutes" at a time, up to "[t]wo hours

maybe" in an eight hour day (Tr. 540), , with breaks in between to lie down and keep the arm elevated.  (Tr. 541-42).

**B.  <u>Medical Evidence and Opinions</u>**

**1.  *Treating physicians***

Among the array of treating source medical records included in the administrative record, those identified by the parties as most significant for purposes of this review are those of Plaintiff's primary care physician, Michael J. Timpone, M.D. (Tr. 357-77, 393-95, 398-99, 404-20, 433-36, 438-446); her oncologist, Mark D. Romer, M.D. (Tr. 211-27, 421-30); and her physiatrist, John C. Jump, M.D.  (Tr. 345-49).

Dr. Timpone apparently has treated Plaintiff since March of 1999.  (*See* Tr. 373).  On May 27, 2003, Dr. Timpone completed a form referencing Plaintiff's original breast cancer surgery in 1999 and "repeat surgery" in November 2002 and December 2002 (*id.*), with the December procedure involving "incision and drainage of a right breast wound abscess."  (Tr. 375).  At the time of completing the form, Dr. Timpone diagnosed Plaintiff with cancer of the right breast with "recurrent procedures for abscesses and suspicious lesions;" post-operative lymphedema of the right arm; neuropathic arm pain; and depression.  (*Id.*).  He reported that she had experienced "persistent" pain since November 2002, and

"mild to moderate" depression with an "ongoing mood and affect problem." (*Id.*). Clinical findings included ongoing tenderness of the right breast, upper arm and underarm; edema of the right arm; and decreased range of motion of the right arm. (*Id.*). Dr. Timpone noted that "edema is better" after use of a compression sleeve and physical therapy, but that pain and range of motion had "not changed." (Tr. 374). Plaintiff was continued on Zoloft and Ambien and instructed to return in two months, with interim limitations of no carrying, lifting, writing or driving with right arm, and "unable to perform any type [of] work qualified to perform" from May 21, 2002 to August 1, 2003." (*Id.*).

On April 19, 2004, Dr. Timpone completed an "Attending Physician's Statement" form for Unum Provident, Plaintiff's long-term disability insurance provider. (Tr. 393-95). His findings included right arm and right breast pain and edema. (Tr. 393). He indicated that Plaintiff had not been released to return to work, and "likely never" would be. (*Id.*). The restrictions he listed included "no push, pull, lift, carry," "repetitive use [of] rt arm," "push over 10 lbs. limited," "lift over 5 lbs. limited." (*Id.)*. He suggested that Plaintiff had "completed physical therapy" with "no significant improvement" and "may be disabled from regular position of employment." (*Id.*). He checked that his functional capacity estimates were based upon his "patient's report," namely "neuropathic pain and

lymphedema" (Tr. 394), and stated that his current functional ability estimates assumed a "max" of "8 hrs/day combined" of "light duty" and "sedentary" work. (Tr. 395).

On July 8, 2004, Dr. Timpone responded to an additional inquiry from Unum Provident by stating that accommodation with a headset and left-handed keyboard was "unlikely to be [a] practical solution" for returning Plaintiff to employment (Tr. 398), because training for a left-handed keyboard was not at available at the job center where Plaintiff had inquired, she had no position to return to once her former employer terminated her job, and her former employer had not been willing to accommodate her need to work a maximum of six hours per day for two to three months. (Tr. 399). "Therefore I would maintain that a return to work with the recommended accommodations is possible but is unlikely to be done for her former position of employment." (*Id.*).

On a form prepared on April 28, 2005, Dr. Timpone indicated that Plaintiff could sit for more than six hours, stand or walk for up to four hours, and rest for one-half hour during each eight hour workday. (Tr. 406). He also indicated that she could rarely or never carry one to five pounds, reach to shoulder height, reach overhead, or seize, grasp, turn or finger with her right hand and arm. (Tr. 407-09). He indicated Plaintiff could not operate a car, truck, crane, tractor or

other motor vehicle, but could work six hours per day, five days per week on a regular and continuing basis, with a restriction of "little repetitive use of her right arm" and with "left hand controls or keyboard plus headset recommended." (Tr. 411). He also checked a line stating that "rest lying down or in a supine position in bed or in an easy chair is <u>not</u> medically indicated." (Tr. 406) (emphasis in original).

On October 7, 2005, Dr. Timpone stated as follows in a letter to Plaintiff's attorney:

> Ms. Jones continues to be followed in our office for problems related to her breast cancer. She has had persistent and severe symptomatology in relation to her upper extremity. She has had resistant lymphedema documented on many office visits . . . She also has neuropathic pain in the right arm which significantly increases with the use of that arm. She has had pain with essentially any recurring use of the right arm, which would include reaching, handling, grasping, or fingering, and does show significant problems operating a car. She would be unable to drive a truck, tractor, or operate a crane or any other type of heavy machinery.
>
> Her condition has been persistent since her original surgery in 1999, with no significant improvement through any type of treatment. I do not expect any improvement in her condition in the foreseeable future.

(Tr. 433).

Dr. Romer treated Plaintiff relative to the cancer in her right breast. During a follow-up examination on May 19, 2004, he reported that he had not seen Plaintiff since August 2002, but she "overall feels well," despite a "main complaint" of "persistent vasomotor symptoms" with "no response to Zoloft." (Tr. 425). "The patient was told to try vitamin E and/or black cohosh" for her vasomotor symptoms, as Dr. Romer "d[id] not recommend estrogen use" given Plaintiff's history of breast cancer. (*Id.*).

At Plaintiff's yearly follow-up in August 2005, Dr. Romer reported that "[h]er main complaint is still significant vasomotor symptoms." (Tr. 421). Plaintiff otherwise "feels well" overall, and left with a recommendation "to begin a trial of black cohosh." (*Id.*).

Dr. Jump, a specialist in physical medicine and rehabilitation, first saw Plaintiff in March 2003, on referral from Dr. Timpone relative to the pain and swelling in her right arm. (Tr. 348). Dr. Jump related Plaintiff's report that she had been diagnosed with "apparent cellulit[i]s of the right arm" and treated with antibiotics in December 2002. (*Id.*). His examination of her right shoulder at that time "reveal[ed] no localized articular or periarticular tenderness to palpation and range of motion is unrestricted," despite "a complaint of some degree of pain in the posterior axillary area at the end range of abduction and forward flexion."

(Tr. 348-49).  Although Plaintiff "does not exhibit objective swelling of significance at this time," Dr. Jump opined that her currents symptoms were consistent with "intermittent right upper extremity lymphedema."  He recommended treatment "with a Jobst pump and possible fitting with a compressive sleeve for the right upper extremity."  (Tr. 349).

At a follow-up visit in June 2003, Dr. Jump reported "minimal change" in Plaintiff's symptoms.  (Tr. 346).  Although "she has been provided with a compression sleeve," Plaintiff "ha[d] not been reevaluated in physical therapy [re] use of a sequential pump."   Dr. Jump recommended that Plaintiff "contact her treating therapist should her right upper extremity edema significantly increase[,] to further consider the possible use of a sequential compression pump."  She was not scheduled for further appointments with Dr. Jump.  (*Id.*).

## 2.    *State Agency physicians*

Plaintiff's medical records were reviewed by Drs. Jon E. Starr and Ellin Cusack Frair, two physicians acting on behalf of the Ohio Bureau of Disability Determination ["BDD"], who completed and signed a "physical residual functional capacity assessment" dated June 25, 2003.  (Tr. 290-94).  At that time, those doctors concluded that Plaintiff's symptoms of right arm pain and swelling "are credible and can be directly attributable to the medically determinable

impairment," but also opined that Plaintiff's "symptoms and reported limitations do not support" the treating source's stated restrictions on Plaintiff's use of her right arm "with writing and driving as well as carrying and lifting." (Tr. 294). As a result, they assessed Plaintiff to have a few "exertional limitations" [*i.e.*, "occasionally" lifting or carrying only 20 pounds; "frequently" lifting or carrying only 10 pounds; and limited pushing and/or pulling in upper extremities, with "no overhead" with right arm] (Tr. 291); a single "manipulative limitation" [*i.e.*, "limited" reaching in all directions, including overhead] (Tr. 292), and no other physical limitations.

Two and a half years later, Ron M. Koppenhoefer, M.D., a physician specializing in physical medicine and rehabilitation, examined Plaintiff on January 23, 2006, at the ALJ's request after continuing Plaintiff's initial hearing. (*See* Tr. 447). Based on her history and his examination, Dr. Koppenhoefer opined that Plaintiff

> would have limitations in the use of her right arm at this time. Her limitations would be in regards to lifting, reaching as well as repetitive activities. I believe she could do these activities only on a very infrequent/ occasion[al] basis.

(Tr. 449). The BDD forms completed by Dr. Koppenhoefer reflected that Plaintiff could lift or carry "very little," and no more than five pounds, with her right arm.

(Tr. 454). He also indicated that she could climb, kneel and crawl only occasionally, and that all her right arm "manipulative functions" were "limited" (Tr. 455), with "handling" to be done on an "isolated" basis, and fingering and feeling only "occasionally" or "isolated." (Tr. 457).

On July 17, 2003, psychologist J. William McIntosh, Ph.D., also conducted a one-time evaluation of Plaintiff at the request of the BDD. (Tr. 295-99). Plaintiff complained to Dr. McIntosh of pain, swelling and loss of strength in her right shoulder and hand, and of "problems with my memory." (Tr. 296). Dr. McIntosh said Plaintiff "looked sad and her overall mood would be described as depressed." (*Id*.). She reported crying "two or three times per week," sometimes "over almost nothing." (*Id*.). Still, Dr. McIntosh found Plaintiff's "memory for recent and remote events seemed fairly good." (Tr. 297). Her ability to understand, remember and carry out one- or two-step job instructions was deemed "good;" her ability to interact with supervisors and coworkers and her ability to withstand the stress and pressure of day-to-day work activity both were "mildly to moderately impaired;" and her ability to maintain concentration and attention sufficient for simple repetitive tasks was "moderately impaired." (Tr. 298-99).

### 3. *Other medical opinion evidence*

Because Plaintiff applied for long-term disability benefits through her employer's disability insurance carrier after leaving her last job, that insurance carrier's medical director, Tanya M. Horne, M.D., also had occasion to review Plaintiff's medical records with respect to her disability status on June 25, 2004. (Tr. 396-97; *see also* Tr. 437). In apparent reliance on an "AP" [attending physician] form submitted by Dr. Timpone (*see* Tr. 394-95, 441), Dr. Horne stated that "[t]he R&Ls [restrictions and limitations] provided are reasonable and permanent," as Plaintiff had "less than [one] hour use of right arm." (Tr. 397, 437). Unum Provident ultimately awarded disability benefits to Plaintiff.

## C. **Vocational Expert Testimony**

Vocational rehabilitation counselor Charlotta Ewers also testified at the second administrative hearing. (Tr. 546-55). She confirmed that Plaintiff's past work history included jobs qualifying as light and sedentary, unskilled, semi-skilled and skilled. (Tr. 548). Asked by the ALJ to assume a hypothetical individual of Plaintiff's age, education and work experience who was restricted to no climbing of ropes, ladders or scaffolds, no work above shoulder level on the right, no exposure to hazards, no lifting or carrying more than five pounds with the right hand, and only simple one-to-two step tasks requiring little concentration, the vocational expert testified that some 12,000 "light" jobs and

16

9,000 "sedentary" jobs would exist in the regional economy for such a person. (Tr. 548-50). Adding a restriction of only occasional fine manipulation with the right hand would reduce the number of available "light" jobs to 6,000, and "sedentary" jobs to 4,000. (Tr. 550). An additional restriction of only occasional gross handling on the right would reduce the "light" jobs to 3,000 and the "sedentary" jobs to 750, while a limitation on use of the right hand to no more than one hour per day would leave no available jobs. (Tr. 551).

III.    ADMINISTRATIVE REVIEW

    A.    "Disability" Defined and the Sequential Evaluation

    The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986). A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health &*

*Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574

F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim

through a five-Step sequential evaluation of the evidence. (*See* Tr. 13-14); *see also*

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Although a dispositive finding at any

Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th

Cir. 2007), if fully considered, the evaluation answers five questions:

1.  Is the claimant engaged in substantial gainful activity?

2.  Does the claimant suffer from one or more severe impairments?

3.  Do the claimant's severe impairments, alone or in combination, meet
    or equal the criteria of an impairment set forth in the
    Commissioner's Listing of Impairments, 20 C.F.R. Subpart P,
    Appendix 1?

4.  Considering the claimant's residual functional capacity, can the
    claimant perform his or her past relevant work?

5.  Considering the claimant's age, education, past work experience,
    and residual functional capacity, can the claimant perform other
    work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001).

**B.      The ALJ's Decision**

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff met the

insured-status requirement for DIB eligibility through December 31, 2007, and that she had not engaged in substantial gainful activity since her claimed disability onset date of May 21, 2002. (Tr. 17).

The ALJ found at Step 2 that Plaintiff has the severe impairments of intermittent right upper extremity pain and swelling second to residuals of a lumpectomy for breast cancer in 1998, and depression. (Tr. 18).

The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meets or equals the level of severity described in Appendix 1, Subpart P of the Regulations. (Tr. 19).

At Step 4 the ALJ concluded that Plaintiff retained the Residual Functional Capacity {"RFC"] to perform "a reduced range of light level work," with limitations to lifting no more than five pounds with her right arm and only occasional using her right arm for fine manipulation or gross handling, for no more than 15 minutes at a time. (*Id.*). He also limited Plaintiff from using her right arm to perform overhead work, from working around hazards, or from climbing ladders, ropes and scaffolds, and restricted her to performing simple one- or two-step tasks that require little if any concentration. (*Id.*).

The ALJ further found that Plaintiff is unable to perform any of her past relevant work as a service representative, assembler, or in "clerk-type jobs." (Tr. 23).

The ALJ's assessment of Plaintiff's Residual Functional Capacity, along with his findings throughout the sequential evaluation, led him to conclude that Plaintiff was not under a disability and thus not eligible for DIB. (Tr. 24-25).

## IV. JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria." *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

"Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F.3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "'more than a scintilla of evidence but less than a preponderance . . .'" *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The required analysis is not driven by whether the Court agrees or disagrees with

an ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *See Bowen*, 478 F.3d at 746. This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

## V.   DISCUSSION

### A.   The Parties' Contentions

Plaintiff contends that the ALJ committed multiple errors in determining that she was not disabled for purposes of DIB benefits, which she identifies as follows, in pertinent part:

> 1.   In failing to consider that Ms. Jones' limitations of functioning and use of her right [arm] equaled a Listing for loss of upper extremity function – §1.07 (due to non-

healing fracture) and/or §1.08 (due to soft tissue injury) [–] and to find that she was thus "disabled" . . .

2.    In failing to find that Ms. Jones was unable to use her right [arm] "occasionally" on a sustained basis . . . which . . . the VE testified[ ] would have precluded all competitive employment.

3.    In failing to find that [Plaintiff's] inability to use [her] dominant hand and arm even occasionally for reaching, handling, grasping or fingering and for lifting over [five] pounds even occasionally[ ] precludes all competitive employment.

4.    In failing to give controlling weight to the medical opinions . . . given by [Plaintiff's] treating physicians.

5.    In finding that there were a significant number of jobs available within Ms. Jones['] restrictions . . .

6.    In misconstruing the evidence of record.

7.    In failing to give any consideration [to] the medical opinion of [the medical director for Plaintiff's long-term disability insurance carrier,] who as a physician is an acceptable medical source [who] must be considered . . .

8.    In failing to consider the determination of [Plaintiff's long-term disability insurance carrier] which granted [disability] benefits to her based upon the same medical [and] vocational standard as on her DIB claim . . .

9.    In relying on the opinions of state medical reviewers . . . made more than [three] years before the decision and . . . before the record was developed . . .

10.    In applying the "sit and squirm test" when determining that in his medical opinion Ms. Jones was not in pain or

in any other distress at her hearings . . . and thus had exaggerated her symptoms in her testimony.

11.     In failing to follow the directives of SSR 83-10 in determining that Ms. Jones could work at the "light" exertional level.

12.     In failing to consider that Ms. Jones['] need to [lie] down 30-45 minutes at [a] time throughout the day . . . would permit less than full[-]time work . . .

(Doc. #9 at 12-13). In light of those alleged errors, Plaintiff asks that the ALJ's decision be reversed and judgment entered in Plaintiff's favor, without the necessity of remand. (*Id.* at 13; Doc. #14 at 5). Alternatively, Plaintiff seeks remand "for the ALJ properly to consider all of the evidence of record." (*Id.*).

In response, the Commissioner urges that Plaintiff has not demonstrated that she satisfies the criteria of Listings 1.07 and 1.08; that substantial evidence supports the ALJ's RFC assessment and his finding that Plaintiff was not entirely credible; and that the ALJ properly considered the evidence underlying the insurance carrier's disability determination, but was not required to defer to the disability determination itself. (Doc. #13 at 12-19). The Commissioner requests that the ALJ's decision be affirmed. (*Id.* at 20).

### B.     Medical Source Opinions

#### 1.     *Treating Medical Sources*

Key among the standards to which an ALJ must adhere is the principle that greater deference is generally given to the opinions of treating medical sources than to the opinions of a non-treating medical source. *Rogers*, 486 F.3d at 242; *see* 20 C.F.R. § 404.1527(d)(2). This is so, the Regulations explain, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a DIB claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examiners, such as consultative examinations or brief hospitalizations . . ." 20 C.F.R. § 404.1527(d)(2); *see also Rogers*, 486 F.3d at 242. In light of this, an ALJ must apply controlling weight to a treating source's opinion when it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.3d at 544; *see also* § 404.1527(d)(2).

If either of these attributes is missing, the treating source's opinion is not deferentially due controlling weight, *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.3d at 544, but the ALJ's analysis does not end there. Instead, the Regulations create a further mandatory task for the ALJ:

> Adjudicators must remember that a finding that a
> treating source medical opinion is not well-supported

> by medically acceptable [data] . . . or is inconsistent with
> other substantial evidence in the case record means only
> that the opinion is not entitled to 'controlling weight,'
> not that the opinion should be rejected . . .

Social Security Ruling 96-2p, 1996 WL 374188 at *4.  The Regulations require the

ALJ to continue the evaluation of the treating source's opinions by considering "a

host of other factors, including the length, frequency, nature, and extent of the

treatment relationship; the supportability and consistency of the physician's

conclusions; the specialization of the physician; and any other relevant factors."

*Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.2d at 544.

"[I]n all cases there remains a presumption, albeit a rebuttable one, that the

opinion of a treating physician [or psychologist] is entitled to great deference, its

non-controlling status notwithstanding."  *Rogers*, 486 F.3d at 242.

### 2.    *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified

physicians and psychologists who are experts in the evaluation of the medical

issues in disability claims under the [Social Security] Act."  Social Security Ruling

96-6p, 1996 WL 374180 at *2.  Yet the Regulations do not permit an ALJ to

automatically accept (or reject) the opinions of a non-treating medical source.  *See*

*id*. at *2-*3.  The Regulations explain, "In deciding whether you are disabled, we

will always consider the medical opinions in your case record together with the

rest of the relevant evidence we receive." 20 C.F.R. §404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in §404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization. *See* 20 C.F.R. § 404.1572(f); *see also* Ruling 96-6p at *2-*3.

### C. Analysis

#### 1. *Listings 1.07 and 1.08*

Essentially conceding that she does not "meet" these Listings (*see* Doc. #14 at 1), Plaintiff nonetheless urges that the ALJ erred in not finding that the condition afflicting her right arm <u>equals</u> Listing 1.07 or 1.08 for loss of upper arm function. (Doc. #9 at allegation of error #1). An impairment is "medically equivalent" to a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). Such "medical equivalence" can be found in three ways. *See* 20 C.F.R. § 404.1526(b). The described course most applicable to Plaintiff's circumstances is as follows:

> If you have an impairment(s) that is not described in appendix 1, we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairment(s) are at least of equal medical significance to those of a listed impairment, we will find that your impairment(s) is medically equivalent to the analogous listing.

20 C.F.R. § 404.1526(b)(2). To show that she equals a listed impairment, a claimant "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (emphasis in original). It is not enough for the claimant to show that the overall functional impact of her impairment is as severe as that of a listed impairment. *See id.*

The listed impairments to which Plaintiff claims her own are "medically equivalent" are as follows:

> 1.07 *Fracture of an upper extremity* with non-union of a fracture of the shaft of the humerus, radius, or ulna, under continuing surgical management, as defined in 1.00M, directed toward restoration of functional use of the extremity, and such function was not restored or expected to be restored within 12 months of onset.

> 1.08 *Soft tissue injury (e.g., burns)* of an upper or lower extremity, . . . under continuing surgical management, as defined in 1.00M, directed toward the salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset.

20 C.F.R. Pt. 404, subpt. P, App. 1 (emphasis in original). In addition:

> M. *Under continuing surgical management*, as used in 1.07 and 1.08, refers to surgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part. It may include such factors as post-surgical procedures, surgical complications, infections,

27

>    or other medical complications, related illnesses, or
>    related treatment that delay the individual's attainment
>    of maximum benefit from therapy . . .

(*Id.*) (emphasis in original).

An impairment will be deemed medically equivalent to a listed impairment if the symptoms, signs and laboratory findings as shown in the medical evidence are at least equal in severity and duration to the listed impairment. *Land v. Sec'y of Health & Human Servs.*, 814 F.2d 241, 245 (6th Cir. 1986). "Generally, the opinion of a medical expert is required before a determination of medical equivalence is made." *Retka v. Comm'r of Soc. Sec.*, 70 F.3d 1272 [table], 1995 WL 697215, at *2 (6th Cir. 1995) (citing 20 C.F.R. § 416.926(b)). The signature of a state agency physician on a disability determination is probative evidence that medical equivalence was considered. *Hicks v. Comm'r of Soc. Sec.*, 105 Fed. Appx. 757,762 (6th Cir. 2004) ("The signature of a State agency medical or psychological consultant . . . ensures that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence.") (quoting SSR. 96-6p, 61 Fed. Reg. 34,466, 34,468 (July 2, 1996)); *Sheets v. Bowen*, 875 F.2d 867 [table], 1989 WL 47444, at *4 (6th Cir. 1989) (citing SSR 83-19). The claimant bears the burden of bringing forth evidence to establish that she meets or equals a listed impairment. *Evans v. Sec'y*

*of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987) (*per curiam*); *see also*

*Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The

burden of providing a . . . record . . . complete and detailed enough to enable the

Secretary to make a disability determination[ ] rests with the claimant.").

Plaintiff has directed this Court to no opinion from any treating physician

directly equating her impairment to one under Listing 1.07 or 1.08 (*see* Docs. ##9,

14), nor has our review of the record disclosed any such opinion.  Although

Plaintiff faults the ALJ for not finding her condition to be the equivalent of one of

those Listings, Plaintiff and her counsel apparently failed to bring evidence of

that claimed equivalency to the attention of the ALJ, "and it is the claimant's

responsibility" to do so.  *Stevens v. Apfel*, 165 F.3d 28 [table], 1998 WL 708728, at

*2 (Sept. 29, 1998) (citing *Landsaw*, 803 F.2d at 214).

Conversely, the signatures of BDD examiners Jon E. Starr, M.D., and Ellin

Cusack Frair, M.D., on the "physical residual functional capacity assessment"

they completed and reviewed <u>is</u> probative evidence that medical equivalence was

considered by a qualified medical professional, but not found to exist.  (*See* Tr.

290-94, 313-17); *see Hicks*, 105 Fed. Appx. at 762; *Sheets*, 1989 WL 47444, at *3.  ALJ

McNichols also made an explicit finding at Step 3 that Plaintiff "does not have an

impairment or combination of impairments that meets or <u>medically</u> <u>equals</u> one of

the listed impairments . . ."  (Tr. 19).  As the circuit court has observed:

> [An] ALJ d[oes] not err by not spelling out every
> consideration that went into the step three
> determination.  The language of 20 C.F.R. § 404.1526
> does not state that the ALJ must articulate, at length, the
> analysis of the medical equivalency issue.  It states that
> the ALJ should review all evidence of impairments to
> see if the sum of impairments is medically equivalent to
> a "listed impairment."  This is exactly what the ALJ did.

*Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411 (6th Cir. 2006).

"Even in cases where the claimant has had an impairment which came

very close to meeting a listing, [the Sixth Circuit] has refused to disturb the

Secretary's finding on medical equivalence."  *Retka*, 1995 WL 697215 at *2 (citing

*Dorton v. Heckler*, 789 F.2d 363, 366 (6th Cir. 1986); *Price v. Heckler*, 767 F.2d 281, 284

(6th Cir. 1985); *see also Sweeney v. Comm'r of Soc. Sec.*, 142 F.3d 436 [table], 1998 WL

124048, at *2 (6th Cir. 1998) (same).  In light of all of the foregoing, this Court also

will not do so here.  Plaintiff's allegation of error on this basis is not well taken.

### 2. *Plaintiff's Residual Functional Capacity*

Most of Plaintiff's remaining allegations of error implicate the ALJ's

finding that Plaintiff retained a RFC for "a reduced range of light level work."

(Tr. 19).  (*See* Doc. #9, allegations of error ##2-4, 7-12).  The gist of Plaintiff's

averments in this regard is that the ALJ erred in rejecting evidence – in the form

of medical opinions and records, Plaintiff's testimony and other evidence –

indicating that Plaintiff's ability to use her right arm and hand is much more

limited than the ALJ's findings recognize.

Among the evidence that Plaintiff contends the ALJ should have adopted

are her treating physicians' opinions that Plaintiff was unable to use her right

arm on a consistent basis even occasionally. (*See id*., allegations of error ## 2-4.

Among her treating physicians, Plaintiff's memorandum specifically invokes

only the reports of Drs. Timpone, Romer and Jump. (*See* Doc. #9, p. 7).

Accordingly, this Court will restrict its examination of her treating physicians'

opinions to those of the three doctors as to whom Plaintiff has identified specific

alleged errors.

A thorough review of ALJ McIntosh's decision reveals that the ALJ neither

recited nor properly applied the regulations applicable to medical source

opinions. (*See* Tr. 14-25). With regard to the opinions of Plaintiff's primary care

physician, the ALJ stated, in pertinent part:

> The restrictions I have imposed fully consider Dr.
> Timpone's assessments and are in part based upon his
> recommendations. For example, I have restricted the
> claimant to lifting no more than five pounds with her
> right arm based upon his assessment, and the additional
> limitations on the claimant's use of her right arm are
> based upon both his medical assessment and those of
> Dr. Koppenhoefer, who more recently physically

31

examined the claimant . . . In addition, I have accepted
Dr. Timpone's opinions in other respects . . . [leading to
the "restriction against expose to hazards" and "from
performing her past relevant work"].

Dr. Timpone also submitted an assessment to the
claimant's private disability insurance carrier in July
2004 in which he indicated that the claimant was unable
to perform even sedentary level work . . . However, this
opinion is contradicted by his later September 2004 and
April 2005 assessments. While [Dr. Timpone] may have
rendered the July 2004 opinion to assist the claimant in
obtaining private disability benefits, his subsequent
conclusions and the remainder of the evidence he
submitted in effect contradict, and thus fail to
adequately support, limiting the claimant to sedentary
work. . .

(Tr. 20).

The foregoing illustrates that while the ALJ declined to adopt Dr.

Timpone's opinions in their entirety based upon his apparent perception that

portions of Dr. Timpone's findings were "not well-supported" and/or were

"inconsistent with other substantial evidence in the case record" – appropriate

reasons under the treating source rule, despite the fact that the ALJ did not

explicitly articulate them as such – the ALJ's analysis does <u>not</u> comply with

further regulatory recognition that lack of support or inconsistency "means only

that the opinion is not entitled to 'controlling weight,' not that the opinion should

be rejected." *See* SSR 96-2p, 1996 WL 374188 at *4. The ALJ's decision does not

reflect that he continued to evaluate Dr. Timpone's opinions in light of the requisite additional factors, including the length, frequency, nature and extent of the treatment relationship; specialization; *etc.* *See Rogers*, 486 F.3d at 242; *Wilson*, 378 F.2d at 544. That failure constitutes error.

Although Plaintiff's Statement of Specific Errors can be read to suggest that similar deficiencies afflict the ALJ's analysis of the opinions of treating physicians Dr. Romer and Dr. Jump (*see* Doc. #9 at 7, 8; allegation of error #4), Plaintiff does not identify, nor has this Court found, any particular "opinion," or even treatment records, from either of those doctors that conflicts with the ALJ's findings. (*See* Tr. 421, 425; 346, 348-49). Accordingly, this Court finds no error in the AJL's handling of the medical evidence relative to Drs. Romer's and Jump's treatment of Plaintiff.

As to the ALJ's error with regard to Dr. Timpone's opinion, there remains the possibility that such error was harmless, *see Bowen*, 478 F.3d at 747-49, an issue neither party specifically addresses. Here, however, the error consists of the ALJ's failure to adhere to established regulatory procedures.

> A court cannot excuse the denial of a mandatory procedural protection simply because . . . a different outcome on remand is unlikely. '[A] procedural error is not made harmless simply because the [aggrieved party] appears to have had little chance of success on the merits anyway.' To hold otherwise, and to

33

recognize substantial evidence as a defense to non-
compliance with §1527(d)(2), would afford the
Commissioner the ability to violate the regulation with
impunity and render the protections promised therein
illusory. The general administrative law rule, after all,
is for a reviewing court, in addition to whatever
substantive factual or legal review is appropriate, to 'set
aside agency action . . . found to be . . . without
observance of procedure required by law.'

*Wilson*, 378 F.3d at 546 (internal citations omitted).

Moreover, a review of the entire record in this matter does <u>not</u> necessarily

compel a conclusion that "a different outcome on remand is unlikely." *See id*.

Here, evidence of the debilitating nature of Plaintiff's impairment, while perhaps

not "overwhelming" in a legal sense, certainly is very strong. In light such

evidence, the ALJ's error was not "harmless" in this instance. Accordingly,

Plaintiff's challenge to the ALJ's evaluation of the medical source opinion of Dr.

Timpone is well taken, obviating the need for in-depth consideration of Plaintiff's

remaining assignments of error.

## VI.    REMAND IS WARRANTED

When an ALJ failed to apply the correct legal standards or his factual

conclusions are not supported by substantial evidence, the Court must decide

whether to remand the case for rehearing or to reverse and order an award of

benefits. Under Sentence 4 of 42 U.S.C. § 405(g), the Court has authority to

affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

In light of the finding that the ALJ made an error of law, remand of this matter to the Social Security Administration pursuant to Sentence 4 of § 405(g) is appropriate, to permit the ALJ to reassess Plaintiff's residual functional capacity. On remand, the ALJ should be directed (1) to re-evaluate the medical source opinions of Dr. Timpone under the legal criteria set forth in the Commissioner's Regulations, Rulings, and as required by case law; and (2) to reconsider, under the required sequential evaluation procedure, whether Plaintiff was under a disability and thus eligible for DIB. Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

**IT THEREFORE IS RECOMMENDED THAT:**

1.     The Commissioner's nondisability finding be
       vacated;

2.     No finding be made as to whether Plaintiff
       Robbin L. Jones was under a "disability" within
       the meaning of the Social Security Act;

3.     This case be remanded to the Commissioner and
       the Administrative Law Judge under Sentence
       Four of 42 U.S.C. § 405(g) for further
       consideration consistent with this Report; and

4.     The case be terminated on the docket of this
       Court.

August 12, 2009                    ___s/ Sharon L. Ovington_____
                                      Sharon L. Ovington
                                   United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten [10] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen [13] days (excluding intervening Saturdays, Sundays and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten [10] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Am*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981).